UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHN BARTLINSKI, Derivatively on Behalf of SANCHEZ ENERGY CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ANTONIO R. SANCHEZ, III, A. R. SANCHEZ, JR., GILBERT A. GARCIA, GREG COLVIN, and ALAN G. JACKSON, <br><br> Defendants, <br><br> -and- <br><br> SANCHEZ ENERGY CORPORATION, a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW <br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a shareholder derivative action brought by plaintiff on behalf of Sanchez Energy Corporation ("Sanchez Energy" or the "Company") against the members of Sanchez Energy's Board of Directors (the "Board").  This action arises out of the Individual Defendants' (as defined herein) pursuit of an amendment to the Company's Certificate of Incorporation that significantly curtails the ability for shareholders and the Company to hold these defendants monetarily liable for breaches of fiduciary duty (the "Amendment").  In order to secure the Amendment, the Individual Defendants issued a Proxy Statement that contained materially false statements in violation of sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 of the U.S. Securities and Exchange Commission ("SEC") promulgated thereunder.

2. In particular, on April 25, 2013, the Individual Defendants filed a Proxy Statement on Form DEF 14A with the SEC (the "Proxy") which sought "approval of an amendment to the certificate of incorporation to add the director exculpation provision." The Amendment would, pursuant to section 102(b)(7) of the Delaware General Corporation Law, eliminate the personal liability of a director of the Company for monetary damages to the fullest extent of the law. In giving its reasons for the Amendment, the Individual Defendants stated that they "must be able to exercise [their] independent business judgment without the fear of being second-guessed by courts and held liable for mistakes of judgment or ordinary negligence." This, however, could not be a reason to recommend the Amendment to shareholders, because, under no circumstance could a director be held monetarily liable for exercising his/her independent business judgment or ordinary negligence. Under Delaware law, which applies to the directors' actions because the Company is incorporated in Delaware, the standard for liability, even for a breach of the fiduciary duty of due care, is ***gross*** negligence. In the context of corporate law, Delaware courts have explained that gross negligence means the same thing as recklessness, a materially higher standard than ordinary negligence.

3. By including the lower "ordinary negligence" standard in the Proxy, the Individual Defendants gave shareholders the false impression that directors face a much greater chance of being held monetarily liable than they actually do. This error concerning when a director faces liability is material, especially when directors are seeking a vote to limit their liability.

4. Unlike a breach of fiduciary duty of care, defendants needed to only act negligently to violate section 14(a) of the Exchange Act.[1] They have acted at least so here. Undoubtedly, the Individual Defendants were spurred to act by the increased scrutiny the Company has received over the self-dealing by the controlling Sanchez Family. For instance, on January 6, 2012, the Company issued defendant A. R. Sanchez, Jr. ("Sanchez, Jr."), 350,000 shares of the Company's stock and Eduardo Sanchez ("E. Sanchez") and Patricio Sanchez ("P. Sanchez"), Sanchez, Jr.'s sons and defendant Antonio R. Sanchez, III's ("Sanchez, III") brothers, 250,000 shares each (collectively, the "Sanchez Family"). The share grants were worth approximately $15 million. The Company had no valid reason for this stock issuance. Amid the public backlash that followed, on June 15, 2012, the Company announced it rescinded the stock grants.

5. The Sanchez Family's failure regarding the stock grants has not prevented them from continuing to try to line their pockets at the Company's expense. Most recently, just two and a half months after shareholders voted on the Amendment, the Company purchased land from Sanchez Family affiliates at a price seventeen times higher than comparable transactions.

6. The Individual Defendants will use the exculpation provision in the Amendment as a shield in lawsuits that seek to hold them accountable for breaching their own duty to the Company as the Sanchez Family continues to try and enrich themselves. However, because the Proxy contained a materially false statement in violation of section 14(a) of the Exchange Act, the shareholder vote is invalid and the exculpation provision was never actually enacted.

---

[1] Because of the anti-waiver provisions in the Exchange Act, the Amendment does not affect the Individual Defendants' obligations to abide by federal securities laws.

Accordingly, plaintiff now seeks a declaration from the Court declaring the Amendment invalid and rescinding its implementation.

## JURISDICTION AND VENUE

7. This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

8. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Sanchez Energy maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Sanchez Energy, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

# THE PARTIES

**Plaintiff**

10. Plaintiff John Bartlinski was a shareholder of Sanchez Energy at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Sanchez Energy shareholder.

**Nominal Defendant**

11. Nominal Defendant Sanchez Energy is a Delaware corporation with principal executive offices located at 1111 Bagby Street, Suite 1800, Houston, Texas. Sanchez Energy is an independent exploration and production company focused on the exploration, acquisition, and development of unconventional oil and natural gas resources in the Eagle Ford Shale in South Texas. Sanchez Energy does not have any employees. Pursuant to a services agreement entered into on December 19, 2011, Sanchez Oil & Gas Corporation ("SOG"), a private oil and natural gas company managed by defendants Sanchez, III and Sanchez, Jr., performs the centralized corporate functions for the Company. These functions include among others, general and administrative services, geological, geophysical, and reserve engineering, lease and land administration, marketing, accounting, operational services, information technology services, compliance, insurance maintenance, and management of outside professionals. SOG's wholly-owned subsidiary, SEP Management I, LLC ("SEP Management"), as its general partner, controls Sanchez Energy Partners I, LP ("SEP I"). SEP I's limited partners include San Juan Oil & Gas No. 2, Ltd. ("San Juan"), Sanexco, Ltd. ("Sanexco"), and SOG, among others. Both San Juan and Sanexco are controlled by their general partner Sanchez Management Corporation which is managed by defendant Sanchez, Jr. On August 7, 2013, Sanchez Energy also entered into a purchase agreement with Altpoint Sanchez Holdings LLC ("Altpoint Holdings") and

Sanchez Resources, LLC ("Sanchez Resources") whereby Sanchez Energy would acquire 50% working interest across an area in the Tuscaloosa Marine Shale ("TMS").

**Defendants**

12.  Defendant Sanchez, III is Sanchez Energy's President, Chief Executive Officer ("CEO"), and a director and has been since August 2011.  Defendant Sanchez, III was also Sanchez Energy's Chairman of the Board from August 2011 to November 2012.  Defendant Sanchez, III is SOG's President and has been since October 2001, SEP Management's President and has been since at least September 2011, and SEP I's Managing Director and has been since at least September 2011.  Defendant Sanchez, III was a member of Sanchez Energy's Audit Committee from at least April 2012 to November 2012 and a member of the Nominating and Corporate Governance Committee from June 2012 to at least April 2013.  Defendant Sanchez, III is the son of defendant Sanchez, Jr. and brother of E. Sanchez and P. Sanchez.  Sanchez Energy paid defendant Sanchez, III the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $325,000 | $800,000 | $1,014 | $1,126,014 |
| 2011 | - | $350,000 | - | $350,000 |

13.  Defendant Sanchez, Jr. is Sanchez Energy's Executive Chairman of the Board and has been since November 2012.  Defendant Sanchez, Jr. is also SOG's CEO, Chairman of the Board, and co-founder.  Defendant Sanchez, Jr. is the father of defendant Sanchez, III and E. Sanchez and P. Sanchez.  Sanchez Energy paid defendant Sanchez, Jr. the following compensation as an executive:

| Fiscal Year | Bonus | Total |
|---|---|---|
| 2012 | $800,000 | $800,000 |

14.  Defendant Gilbert A. Garcia ("Garcia") is a Sanchez Energy director and has been since December 2011.  Defendant Garcia is also Chairman of Sanchez Energy's Audit

Committee and has been since December 2011.  Sanchez Energy paid defendant Garcia the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $86,904.11 | $151,102 | $238,006.11 |

15.     Defendant Greg Colvin ("Colvin") is a Sanchez Energy director and has been since March 2012.  Defendant Colvin is also Chairman of Sanchez Energy's Nominating and Corporate Governance Committee and has been since June 2012.  Sanchez Energy paid defendant Colvin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $67,154.11 | $205,626 | $272,780.11 |

16.     Defendant Alan G. Jackson ("Jackson") is a Sanchez Energy director and has been since November 2012.  Sanchez Energy paid defendant Jackson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $7,089.04 | $158,240 | $165,329.04 |

**Non-Defendant Relevant Individuals and Entities**

17.     E. Sanchez is the CEO of Sanchez Resources, which he founded in 2010.  E. Sanchez is also the son of defendant Sanchez, Jr. and brother of defendant Sanchez, III.

18.     P. Sanchez is the Executive Vice President of SOG.  P. Sanchez is also the son of defendant Sanchez, Jr. and brother of defendant Sanchez, III.

19.     Sanchez Resources is a Delaware limited liability company that owns approximately $120 million of proved conventional oil properties in Louisiana and Mississippi and has amassed an 80,000 net acre position in TMS.  Defendants Sanchez, III and Sanchez, Jr. indirectly own equity interests in Sanchez Resources.

20. Altpoint Capital Partners LLC ("Altpoint Capital") is a Delaware limited liability company based in New York. Altpoint Capital is a middle market private equity firm specializing in energy, industrial, and telecommunications investments.

21. Altpoint Holdings is a Delaware limited liability company created for purposes of Altpoint Capital's investment in Sanchez Resources.

22. The defendant identified in ¶12 is referred to herein as the "Officer Defendant." The defendants identified in ¶¶12-16 are referred to herein as the "Director Defendants." Collectively, the defendants identified in ¶¶12-16 are referred to herein as the "Individual Defendants."

## THE SANCHEZ FAMILY HAS A HISTORY OF TRYING TO LINE ITS POCKETS AT THE COMPANY'S EXPENSE

23. Though the Company is a public company, the Sanchez Family treats Sanchez Energy as if it was still their privately controlled company. Indeed, in the Company's Certificate of Incorporation, the Sanchez Family wrote in a clause that allowed it to compete directly with the Company (though its validity is questionable). In particular, Section 9.2 of the Certificate of Incorporation states that Sanchez Family businesses—such as SOG and its affiliates—"have the right to engage (and shall have no duty to refrain from engaging) in the same or similar activities or lines of business as the Corporation." Section 9.3 similarly provides that:

> [I]f the [Sanchez affiliates] acquire knowledge of a potential Business Opportunity that may be deemed a corporate opportunity of both the Corporation and any of the [Sanchez affiliates], then such [parties] shall have no duty to communicate or offer such Business Opportunity, or information regarding such Business Opportunity, to the Corporation.

24. In addition, the Sanchez Family has used their control of the Company and Board to reap and attempt to reap substantial benefits at the Company's expense. For instance, on January 6, 2012, the Board granted restricted stock to defendant Sanchez, Jr. and E. Sanchez and

P. Sanchez. The Board granted defendant Sanchez, Jr. 350,000 shares worth $6,149,500 and E. and P. Sanchez 250,000 shares a piece, each worth $4,392,500. Notably, the Board granted this stock even though E. and P. Sanchez did not work at the Company. The Board stated in the Company's 2012 Proxy Statement that the awards were in recognition of the importance of the Company's relationship with SOG. Even this flimsy argument made no sense as it concerned E. Sanchez, since he does not even work at SOG. The Company did not disclose this stock until the Company's 2012 Proxy Statement three months later.

25. After the public learned of the stock grants, a number of press releases were issued early June 2012 questioning whether such a grant was a proper exercise of the Board's fiduciary duty. On June 15, 2012, the Company announced that the Board rescinded these option grants.

26. The need to rescind the improper stock awards has not deterred the Sanchez Family from attempting to enrich itself at the expense of the Company. The Company's purchase of TMS is the most notable effort to date of the members of the Sanchez Family taking advantage of the Sanchez Energy for their own benefit. Notably, Sanchez Energy announced this transaction only two months after the shareholder vote on the Amendment.

27. TMS is an area of oil and gas reserves stretching across Eastern Louisiana and Southwestern Mississippi. SOG, which, as stated above, is controlled by the Sanchez Family, began buying drilling rights on properties in the heart of the TMS in 2010.

28. When the Sanchez Family formed Sanchez Resources in 2010, they used that entity to raise capital to purchase drilling rights in the TMS from SOG and other lease holders. Altpoint Capital invested heavily in Sanchez Resources.

29. By 2013, Sanchez Resources held the working interest in 80,000 acres in the TMS —40,000 acres of which is developed and 40,000 of which is undeveloped. Once the TMS reserves were proven in 2013, the Sanchez Family sought to develop the undeveloped half of Sanchez Resources' holdings in the TMS. Altpoint Capital, however, balked at financing the development costs.

30. As a result, the Sanchez Family decided that it had to buyout Altpoint Capital's interests. On August 8, 2013, the Company announced that it had entered into an agreement with Altpoint Capital[2] and Sanchez Resources to acquire the 40,000 undeveloped acres, buying out all of Altpoint Capital's working interest and a portion of Sanchez Resources' working interest in the acreage.[3] In connection with this transaction, Sanchez Energy paid $77.5 million in cash and stock. $61 million was paid to Altpoint Capital (consisting of $53.5 million in cash and 342,760 shares of Sanchez Energy common stock valued at approximately $7.5 million), $14.4 million in cash to Sanchez Resources, and $2.1 million to an undisclosed third party. In addition to the cash consideration, the Company agreed to cover the costs for Sanchez Resources of three oil wells Sanchez Energy planned to drill within the AMI. Also, if Sanchez Energy continues to drill in the AMI, it agreed to carry the costs of an additional three wells for Sanchez Resources. According to a November 10, 2013 article published in *The Wall Street Journal* ("WSJ"), the Company carrying the costs of the oil wells for Sanchez Resources' benefit is worth approximately $22 million. In total, Sanchez Energy paid consideration worth approximately

---

[2] The agreement was executed between Sanchez Energy, Sanchez Resources, and Altpoint Holdings.

[3] The 40,000 undeveloped acres were then combined with the 40,000 developed acres owned by Sanchez Resources to create an 80,000 acre area of mutual interest ("AMI"). After this transaction, Sanchez Energy and Sanchez Resources each owned a 50% undivided working interest in the AMI.

$100 million to acquire these working interests in the TMS, which equates to a purchase price of roughly $2,500 per acre.

31.     The price paid by Sanchez Energy for undeveloped acreage and its working interests in the AMI is out of line with comparable transactions in the TMS.  In August 2013, Goodrich Petroleum Corporation ("Goodrich"), the largest acreage owner in the TMS, acquired a 172,000 acre working interest in the TMS from Devon Energy. According to the November 10, 2013, WSJ article, Goodrich paid only $144 per acre. Thus, Sanchez Energy agreed to pay roughly seventeen times more per similarly situated acre to Sanchez Resources than Goodrich did in a true arm's-length deal.

32.     When asked about the price paid per acre by an analyst during the August 8, 2013 earnings conference call, defendant Sanchez, III stated:

> The bulk of what ended up being the ultimate purchase price was negotiated between us and the private equity group that I had previously mentioned. This is a process that took a couple of months.  As you could imagine, we had different views on what it should transact at. We ultimately got to a purchase price of $61 million with them.  So two-thirds of the answer, which is two-thirds of the purchase price is a function of negotiated transaction—the price that we agreed to basically to take them out of this position.

33.     Defendant Sanchez, III's justification for the transactions purchase price is severely lacking.  Effectively, Altpoint Capital demanded an outlandish price for its interests in the TMS, which the Sanchez Family agreed to pay using the Company's money.  The Sanchez Family received a substantial benefit from this transaction.  In particular, Sanchez Resources received $14.4 million in cash, six operational oil wells free of cost, and a continued 50% interest in the AMI.  In addition, since the Sanchez Family controls the Company's operations through SOG, it is now free of any outside pressures, such as from Altpoint Capital.

34. Although the Company drastically overpaying for its 50% interest in the AMI is probably the worst part of the transaction, it is not the most underhanded aspect of it. That distinction goes to the royalty fee that the Company will have to pay to Sanchez Resources.

35. In 2011, SOG began leasing oil and gas rights from property owners. SOG typically paid $10 and a royalty fee of between 12% and 16% of anything produced from drilling operations on the land, an industry standard fee. After receiving Altpoint Capital's investment, Sanchez Resources purchased SOG's oil and gas rights leases[4] for $10 and "other good and valuable consideration." The "other good and valuable consideration" is not defined within the lease.

36. One week after Sanchez Energy announced the above transaction, on August 15, 2013, SR Acquisition assigned 32.4% of its interest in the 40,000 undeveloped acres to Altpoint Holdings. In this assignment, Altpoint Holdings agreed to pay $10, *plus* an overriding royalty to SR Acquisition of 25% of anything produced from drilling operations on the land, less the royalty payment owed to the land owner.[5] The next day, on August 16, 2013, Altpoint Holdings sold its interest – for which it paid $10 – to Sanchez Energy for $61 million in cash and Company stock and subject to all obligations in prior lease agreements, including the 25% overriding royalty to Sanchez Resources.

---

[4] SOG assigned all of its oil and gas contracts in the TMS to SR Acquisition I, LLC ("SR Acquisition"), which is a holding company for Sanchez Resources.

[5] The lease assignment states, in pertinent part, "[t]here is reserved unto [SR Acquisition] ... an overriding royalty interest equal to the positive difference, if any, between all lease royalties, overriding royalties, and other similar type lease burdens of record and affecting [SR Acquisition]'s interest in the Leases as of the date of this Assignment. The overriding royalty interest herein reserved shall be reduced in proportion to the interest herein assigned, and shall be further proportionately reduced in the event any of the Leases cover less than 100% of the mineral estate."

37. Under the terms of the transaction, Sanchez Energy purchased all of Altpoint Holdings' interests and various other interests from Sanchez Resources and other third parties, which gave Sanchez Energy ownership of the oil and gas contracts for the 40,000 undeveloped acres. As the holder of the leases on that acreage, Sanchez Energy is liable to the original property holders for all of the 12% to 16% royalties on any oil and gas produced from the land. And because Sanchez Energy acquired most of those leases through Altpoint Holdings, it is also liable to Sanchez Resources, through SR Acquisition, for a 25% overriding royalty on any oil and gas produced from leases acquired from Altpoint Holdings.

38. The Company's shareholders have already filed derivative actions seeking to challenge this transaction. Undoubtedly, the Board will point to the Amendment to claim that it is exculpated from any breach of its fiduciary duty of care. Based on the comments by defendant Sanchez, III, it appears that this transaction was already being worked out at the time of the Proxy. In particular, when describing the origins of the transaction during an August 8, 2013 earnings conference call, defendant Sanchez, III stated, "this TMS really started to get hot a few months ago, we approached them and we said—look guys, you guys want to start writing some checks, and let's go drill some wells? They said—we'd rather take your stock; let's figure out how to make this a transaction that could work." Further, the Sanchez Family has likely been looking for the right moment and a way to buyout Altpoint Capital for years. During the same conference call, defendant Sanchez, III stated, "[w]e have been watching the evolution of the TMS and assessing the technical and economic development of the play for almost three years."

39. Seeing the response the previous year to their improper grant of stock to the Sanchez Family, the Board knew that its actions would be closely scrutinized, especially as it concerned self-dealing transactions between the Company and the Sanchez Family.

Accordingly, it was of great importance to the Board that shareholders approve the Amendment and limit their liability as much as possible. Accordingly, the Board acted at least negligently when it included the wrong standard of law in the Proxy.

## THE MATERIALLY MISLEADING PROXY

40. In order to implement the Amendment, the Board needed to secure shareholder approval for it. Accordingly, the Board filed the Proxy with the SEC on April 25, 2013. The Proxy contained the false statement concerning the potential liability directors of the Company face and the Board's reasons for recommending the Amendment. In particular, the Board stated in the Proxy:

> **Background and Reasons for the Proposed Amendment**
>
> In order for a corporation to function properly, the directors of the corporation must be able to *exercise independent business judgment without the fear of being second-guessed by courts and held liable for mistakes of judgment or ordinary negligence*. The risk of investigations, claims, actions, suits or proceedings (including derivative actions) seeking to impose liability on directors of corporations is not uncommon. In this environment, an individual may conclude that the potential exposure to the costs and risks of proceedings in which the individual may become involved as a director exceed any benefit to the individual from serving as a director. The Board believes that, for this reason, provisions similar to the Director Exculpation Provision are routinely included in the certificates of incorporation of publicly traded Delaware corporations.

41. This statement is false and misleading because it affirmatively states that directors could be liable for acting with ordinary negligence or mistakes of their independent business judgment. However, under Delaware law, directors could never be held liable for breaching their fiduciary duty by acting with ordinary negligence while exercising their independent business judgment. As numerous Delaware Courts have explained, director liability is predicated on the concept of gross negligence. Gross negligence has been defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are

without the bounds of reason." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (citation omitted). In asking shareholders to approve an amendment that limits their liability, it is vital that directors accurately describe the liability that they currently face necessitating such an amendment. The Individual Defendants themselves must have realized that by including the above statement, which incorrectly states when directors face liability without the Amendment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

42. Plaintiff brings this action derivatively in the right and for the benefit of Sanchez Energy. Sanchez Energy is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

43. Plaintiff will adequately and fairly represent the interests of Sanchez Energy in enforcing and prosecuting its rights.

44. Plaintiff was a shareholder of Sanchez Energy at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Sanchez Energy shareholder.

45. The current Board of Sanchez Energy consists of the following five individuals: defendants Sanchez, Jr., Sanchez, III, Garcia, Colvin, and Jackson. Plaintiff has not made any demand on the present Board to institute this action because such a demand is excused.

46. Each of the Individual Defendants face a substantial likelihood of liability for issuing, causing to be issued, and participating in the issuance of materially false and misleading statements to shareholders that were contained in the Proxy. The Proxy contained materially incorrect information concerning the liability that directors faced from serving on the Board of the Company without the approval of the Amendment. Individual Defendants were at least

negligent in filing the Proxy with these materially false and misleading statements.

47. Plaintiff has not made any demand on the other shareholders of Sanchez Energy to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) Sanchez Energy is a publicly held company with over 46.3 million shares outstanding and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

48. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

49. The Individual Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the Company's Proxy. The Proxy contained a recommendation from the Board to the Company's shareholders that they vote on the Amendment.

50. The Proxy misrepresented material information, in particular, the standards for liability against directors.

51. The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

52. The false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on whether to approve of the Amendment. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

53. By reason of the foregoing, the Individual Defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

54. If not for the materially misleading Proxy, shareholders would not have voted on and approved the Amendment.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Sanchez Energy, demands judgment as follows:

A. Declaring that the Individual Defendants violated section 14(a) of the Exchange Act;

B. Injunctive relief declaring the shareholder vote approving the Amendment null and void and rescinding, to the amount already implemented, the Amendment;

C. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 12, 2014             THE WARNER LAW FIRM
PAUL T. WARNER

*s/Paul T. Warner*
PAUL T. WARNER

SBN: 00791884
SDTXBN: 25143
11123 McCracken Circle, Suite A
Cypress, TX 77429
Telephone: (281) 664-7777
Facsimile: (281) 664-7774
pwarner@warner-law.net

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
MICHAEL J. NICOUD
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
mnicoud@robbinsarroyo.com

LAW OFFICES OF NICHOLAS
  KOLUNCICH III, LLC
NICHOLAS KOLUNCICH III
6501 Americas Parkway NE
One Park Square - Suite 820
Albuquerque, NM 87110
Telephone: (505) 881-2228
Facsimile: (505) 881-4288
nkoluncich@newmexicoclassactions.com

Attorneys for Plaintiff

926630

## VERIFICATION

I, John Bartlinski, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Violation of Federal Securities Law. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 2/11/14

JOHN BARTLINSKI